# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

**BAY VIEW CHAUTAUQUA**
**INCLUSIVENESS GROUP,**                              CASE NO.

      Plaintiff,

vs.                                                                    HON.

**THE BAY VIEW ASSOCIATION OF**
**THE UNITED METHODIST CHURCH**,
*a Michigan Summer Resort and Assembly Association,*
**THE BOARD OF THE BAY VIEW ASSOCIATION OF THE**
**UNITED METHODIST CHURCH**, *its governing body,*
*and* **BAY VIEW REAL ESTATE MANAGEMENT,**
**INC**., *a domestic profit corporation,*

      Defendants.

---

| | |
|---|---|
| Sarah S. Prescott (P70510) | Robert A. Callahan (P47600) |
| SALVATORE PRESCOTT & PORTER, PLLC | Jeffrey C. Gerish (P51338) |
| Attorneys for Plaintiff | PLUNKETT COONEY |
| 105 East Main Street | *Attorneys for Defendants* |
| Northville, MI 48167 | 950 Trade Centre Way, Suite 310 |
| (248) 679-8711 | Portage, MI 49002-0493 |
| prescott@spplawyers.com | (269) 226-8822 |
| | rcallahan@plunkettcooney.com |
| | jgerish@plunkettcooney.com |

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

*This case may be considered a companion case to 17-CV-0622. Although it involves the same parties and historical context, it involves actions that occurred after the filing of that case.*

Plaintiff BAY VIEW CHAUTAUQUA INCLUSIVENESS GROUP, by its attorneys, complain against Defendants as follows:

### OVERVIEW

1.    The Bay View Association of the United Methodist Church is a community of cottages, lodgings, and multi-purpose buildings situated just northeast of Petoskey, Michigan.

2.    Bay View was organized under a unique Michigan law that delegates substantial

governmental powers to the entity.

3. As an entity invested with powers and duties of government, Bay View is bound by the Constitutional and statutory prohibitions against establishment of religion and against religious discrimination.

4. Nevertheless, the Bay View Defendants enforce and perpetuate rules restricting cottage ownership only to individuals who avow Christian beliefs. Those not willing to support the teachings of a particular Christian Church are prohibited from purchasing cottages in Bay View.

5. This religious discrimination violates the U.S. and Michigan Constitutions, the Federal Fair Housing Act (42 U.S.C. § 3601 *et seq.*) and Michigan's Elliott-Larsen Civil Rights Act (MCL § 32.2101 *et. seq.*).

## PARTIES

6. Plaintiff is a club made up of individuals deprived of their legal rights because of the Bay View membership policies, joined in an association to mutually collaborate in methods of bringing about change while preserving their community's long-term viability.

7. Members of Plaintiff include existing owners whose children and grandchildren cannot inherit Bay View cottages because they do not meet the religious test described more fully herein; a situation that interrupts a family tradition of as much as six generations.

8. Members of Plaintiff include individuals who seek to buy homes in the community, but who are not practicing Christians and, therefore, cannot do so.

9. Members of Plaintiff include existing owners who object to membership requirements favoring practicing Christians and refusing sales to non-practicing Christians. These members seek to live in a religiously diverse and free community, but cannot do so under

2

the current rules and practices.

10. Members include existing owners who cannot pass their sizeable, illiquid asset—their Bay View cottage—to their spouses, due to the religious test.

11. Members also include existing owners who cannot sell their cottage in the open market on commercially reasonable terms, and whose property values are affected (on information and belief) by the challenged dictates, which restrict sales to a small segment of willing buyers.

12. The natural persons who make up the Plaintiff club have irrevocably assigned, transferred and set over to the Plaintiff club all rights, title and interest he/she/ or they hold in the claims, demands and causes of action in this suit. The natural persons who make up the Plaintiff club have appointed Plaintiff as his/her/their attorney-in-fact with authority to litigate this matter, and each has agreed to be bound by the results of the litigation. These assignments are non-transferable, and each natural club member has represented that he/she/they have not assigned the matter to any other such assignee.

13. Defendant Bay View Association is a Summer Resort and Assembly Association organized under Act 39 of the Public Acts of 1889, MCL § 455.51 *et seq.*

14. Defendant Board of Bay View Association is the body with authority to carry out and enforce orders of this Court. It promulgates and enforces the unlawful policies and practices at issue here.

15. Defendant Bay View Real Estate Management, Inc. is a corporation and a wholly-owned, for-profit subsidiary of Bay View Association organized under the Business Corporation Act, Act 284 of the Public Acts of 1972, MCL § 450.1101 *et seq.*

16. Defendants are collectively described in this Complaint as "Bay View," except as noted.

## JURISDICTION AND VENUE

17. Bay View's religious discrimination in cottage ownership violates the First Amendment of the U.S. Constitution, the Michigan Constitution, the Federal Fair Housing Act (42 U.S.C. § 3601 *et seq.*), Michigan's Elliott-Larsen Civil Rights Act (MCL § 32.2101 *et seq.*) and other provisions set forth herein.

18. Subject matter jurisdiction to resolve this matter therefore arises under 42 U.S.C. § 1983 and 42 U.S.C. § 3613(a)(1)(A), *et seq.* and 28 U.S.C. §§ 1331 and 1343.

19. Insofar as this complaint seeks declaratory relief, jurisdiction also arises under 28 U.S.C. § 2201 *et seq.*

20. The Court has pendent jurisdiction over the related State law claims pursuant to 28 U.S.C. § 1367.

21. Defendants reside in this District within the meaning of 28 U.S.C. § 1391, in that they are subject to the Court's personal jurisdiction with respect to the civil action in question.

22. Specifically, Defendants regularly transact business within Michigan, including within this District.

23. Moreover, the events giving rise to this suit occurred in this District. Among other things, this District is the place where Defendants headquarter and the place where the community at issue is physically located and the unlawful policies and practices at issue are carried out.

24. Accordingly, venue is appropriately laid in this Court under 28 U.S.C. § 1391.

# FACTS

## The Delegation to Bay View and Its Exercise of Police Powers

25.    Bay View was founded in 1875 and was later formally recognized under the 1889 Summer Resort Act.

26.    The State of Michigan, as sovereign, delegates to summer resort associations organized under the 1889 Act, including Bay View, substantial government powers.

27.    Among the government powers delegated to Bay View is the power to appoint a board of assessors. MCL §§ 455.68-71.

28.    Among the government powers delegated to Bay View is the power to levy and collect taxes. MCL § 455.67.

29.    Moreover, State law delegates to the Defendant Board "the management and control of the business, finances, rights, interests, buildings and all property, real and personal, of the association." *Id.*

30.    State law further empowers Bay View, by and through its Board, to manage public health concerns on the land by delegating responsibilities for drainage and access to water. *Id.*

31.    The Defendant Board likewise controls access to land by constructing docks, erecting and maintaining streets and highways on the property, as well as all buildings that sit atop the land that the community collectively owns.  *See id.* and MCL § 455.58.

32.    In addition to controlling the physical premises, the State delegates the power to control the way the land is used, giving this community police powers.

33.    For instance, Bay View may license and limit trucks conveying goods on the land; provide protection from loss or damage from fire or contagious diseases; and outlaw certain behaviors including:

> Disorderly assemblies . . . gaming and disorderly houses . . . billiard tables, bowling alleys, fraudulent and gaming devices, the selling or giving away any spirituous or fermented liquors; to prohibit and abate all nuisances and all slaughter houses, meat markets, butcher shops, glue factories, and all such other offensive houses and places as the board of trustees may deem necessary for the health, comfort and convenience of the occupants upon such lands.

MCL § 455.58.

34. Bay View can further limit the speed of cars; prevent dogs from running free; and require residents to engage in basic maintenance; etc.

35. In addition, Bay View may make, amend, and enforce the laws or regulations enacted by the community. *See, e.g.,* MCL § 455.59.

36. To do so, Bay View is delegated the power to deputize a marshal:

> The board of trustees may appoint a marshal, whose duties shall be to enforce the bylaws of said corporation. Said marshal **shall have the authority of a deputy sheriff** in maintaining peace and order and the enforcement of law on the lands under the jurisdiction of the corporation, and in addition thereto shall be vested with authority to make arrests, in accordance with law, for the violation of the bylaws of said corporation.

MCL § 455.215 (emphasis added).

37. The penalties at issue include fines and imprisonment:

> Any person who shall violate any of such bylaws made as in said last section provided, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding 25 dollars or imprisonment in the county jail not to exceed 30 days, or by both such fine and imprisonment in the discretion of the court, which fine shall go to the same fund as other fines for misdemeanor in the township where such association lands may be located.

MCL § 455.60.

38. Michigan's Attorney General has determined that delegation of this sort is "substantial authority which is governmental in character and which clearly may affect the rights of the

6

public." Op. Att'y Gen. 1997 No. 6942 (interpreting similar delegation of state authority

pursuant to the Summer Resort Owners Corporation Act, 1929 PA 137, MCL § 455.201 *et*

*seq.*, for purposes of determining applicability of FOIA to these entities).

39.     Moreover, Bay View's bylaws take full advantage of the delegation of public functions to

summer resorts by the Act.

40.     Indeed, municipal powers delegated by the Act are incorporated into provisions of the Bay

View bylaws, including but not limited to:

a.  Bylaw 3 references the powers of boards of trustees under the 1889 Summer
    Resort Act.

b.  Bylaws 23 through 27 describe the functioning of the Bay View
    Association's Board of Assessors.

c.  Bylaw 28 provides that the Bay View Association's Board may appoint
    marshals who "shall have the power of arrest and enforcement as provided
    by law".

d.  Bylaws 40-a through 40-e govern building permits and architectural review
    of cottage modifications.

e.  Bylaws 57 and 58 regulate commercial activity (including requiring a
    permit to engage in commercial activity, which is issued by the Bay View
    Board).

f.  Bylaws 59 through 63 regulate personal conduct, including prohibition of
    gambling, alcoholic beverages in public buildings, use of firearms,
    regulation of dogs and other pets and restriction of ***all*** "activities" generally
    on Sunday mornings.

g.  Bylaws 64 and 65 make Michigan traffic laws applicable in Bay View.

h.  Finally, consistent with MCL § 455.60, Bylaw 66 authorizes fines and
    imprisonment for violations of the Bay View Association's bylaws.

Exh. A, Current bylaws.

## Historic Bay View Policy and Practice Established a Preference for the Christian Religion and Specifically the United Methodist Church

41.     Other than paying a membership fee, the only requirements for Bay View membership and cottage ownership under the original Articles of Association and bylaws was that an applicant be of "good moral character" and be twenty-one years old.  Exh. B, 1890 Articles.

42.     However, over time, Bay View has aligned itself with, and endorsed and promoted, the Christian religion, even as it maintains and uses State-delegated police power.

43.     Hence, while Jews and other non-religious families once owned homes in Bay View, in or around 1942, the Bay View Board adopted a resolution rolling back almost 70 years of tolerance of religious diversity and stating:

> "… no person shall be accepted as a member of this association or be allowed to rent or lease property or a room, for longer than a period of one day, unless such person is **of the white race and a Christian** who must provide acceptable and good recommendations. This resolution does not apply to servants within a household or to employes" (sic).

44.     Likewise, as of 1945, the Articles of Association were amended **to** change Bay View's purpose to the "promotion of the **Christian** religion and morality."  Exh. C, 1945 Articles of Association purposes clause, as amended (emphasis added); *see also* current Articles, Exh. D.

45.     By 1959, the race requirement was eliminated, but the religious test remained, and the 1960s through 1980s saw further restrictions on the precise sect of Christian owners permitted to own cottages in Bay View.

46.     For example, Bay View actively enforced a requirement restricting the Roman Catholic membership to 10% or less during this period. When the quota was filled, Roman Catholic applicants were rejected.  In one case, a doctor J.D. had already bought a cottage, which he was then required to sell due solely to his religion and the religious quota.  The letter calling

for the sale listed the then-current Catholic owners, reflecting the quota for his sect was full.

47. By 1986, Bay View instituted a bylaw requirement that would-be members now provide a minister's letter establishing active participation in a Christian Church, a change which excluded "unchurched" Christians from cottage ownership for the first time in Bay View's then 111 years of existence.

48. Specifically, Article 1-d of the Bay View bylaws, added in 1986, provides that the conditions of membership include, among other things, that the applicant: "is of Christian persuasion" and provides a reference letter from a pastor or church leader of the church the applicant attends or of which he is a member. Exh. E, 1986 Bylaws (as amended); Exh. F, Bylaws from May 2016-August 2018. This is a disputed provision at issue in this case.

49. Between 2007 and present, Bay View's leadership has steadily attempted to align Bay View formally with the United Methodist Church—a process that has been met with resistance by the Plaintiff's members, many of whom espouse and hold dear Christian religious beliefs and principles, but who also cherish civil rights and religious freedom.

50. In particular, Bay View has enacted the following changes to the bylaws to appear to align more closely with the United Methodist Church:

   a. Article 2 of the bylaws states that 60% of the "Trustees shall be members of The United Methodist Church whose election shall be ratified by the West Michigan Conference of the United Methodist Church."

   b. Article 77-b of the bylaws states: "In addition, any amendments to paragraphs 2 regarding the Methodist majority and conference ratification requirements only, 75-b or 77-b, must be approved by the West Michigan Conference of the United Methodist Church."
   *Id.*

51. In 2013, Bay View filed articles of amendment with Michigan's Department of Licensing

and Regulatory Affairs (LARA) on an ecclesiastical corporation form.

52.    However, LARA rejected the filing, because Bay View is not, and never has been, an
ecclesiastical corporation. *See* Exh. G, 9/10/13 LARA Determination.

53.    In August 2015, Bay View attempted to amend the Articles of Association to align with
the above-described bylaw changes (see Para. 50.a. & b.), which Plaintiff challenges here.
These Article changes purported to grant the United Methodist Church certain control
rights over Bay View's affairs (the "Methodist Control Amendments").

54.    The Methodist Control Amendments would have altered the Bay View Articles as follows:

   a.  Providing that the entity is organized and operated exclusively for the
       benefit of, to perform the functions of, or to carry out the purposes of the
       United Methodist Church and is operated, supervised or controlled by the
       United Methodist Church.

   b.  Establishing that at all times, at least sixty percent of the members of the
       organization's Board of Trustees must be appointed by the West Michigan
       Conference of the United Methodist Church, an organization required to act
       in accordance with The Book of Discipline of the United Methodist Church.

   c.  Restricting future amendments to certain provisions only upon approval of
       the West Michigan Conference of the United Methodist Church, namely
       Article III, Section 2; Article VII, Section 2, Article X and Article XII.

   Exh. H, Rejected Articles.

55.    An ecclesiastical corporation subject to MCL § 450.179 can subject itself to the control of
a "higher ecclesiastical body".

56.    However, as noted above, Bay View is not an ecclesiastic corporation.

57.    Accordingly, LARA rejected these amendments and the subordination of this entity to a
Church—explaining there was no statutory authority for the proposed amendments and
finding that they would be inconsistent with the 1889 Summer Resort Act and the Michigan
Nonprofit Corporation Act.

58.    Undeterred, Defendants attempted over and over again to formalize these attempted

changes to the Articles by various devices, and LARA repeatedly refused them on June 28, August 2, September 15 and September 16, 2016. Exh. I, LARA Determinations.

59. Notwithstanding these rejections of formal Articles, Bay View continues to operate according to the above-quoted Article 2 and Article 77-b, found in Exhibit F and continued in the current bylaws as well.

**Bay View Is an Independent Entity with a For-Profit Real Estate Subsidiary and Is not under the Control or Supervision of any Church**

60. Bay View is not a church and is not the property of any church.

61. All United Methodist Churches are required to pay an apportionment fee.

62. However, Bay View does not now, and never has, paid such fees.

63. Bay View does not appear in Detroit or West Michigan Conference annual journals as an affiliated organization or mission of the Church.

64. Moreover, neither the United Methodist Church, nor any other church, has entered any formal affiliation agreement with Bay View in its history, such as an agreement to operate or control Bay View.

65. Rather, individuals privately own and operate each of the more than 400 cottages and the two Inns within Bay View.

66. Bay View is not associated with a religious organization within the meaning of the Fair Housing Act.

67. For example, Bay View is not in practice controlled, supervised, or operated in conjunction with the United Methodist Church—or any church or charity—but operates independently. Indeed, its leasehold operations are managed by the *for-profit* subsidiary Defendant as explained more fully below.

68. Moreover, Bay View elects its own Trustees, and does not have, and has never, selected its

Trustees based on the dictate of any church.

69.     The United Methodist Church has not historically voted on or otherwise controlled Bay View's operations.

70.     A Methodist Bishop who serves *ex officio* on the Defendant Board does not have the right to vote, and has rarely attended or been represented at a Board of Trustees meeting over the 141 years of Bay View's existence.

71.     Bay View selects a Director of Religious Life with no approval required by the United Methodist Church, and this Director is not required to be a United Methodist.

72.     Indeed, two of the past three directors, including the current Director, are adherents to other sects of the Christian religion.

73.     State law confirms Bay View is not a church or religious organization in multiple respects.

74.     First, the real property of a corporation like The Bay View Association of the United Methodist Church, organized under the 1889 Summer Resort Act property, is subject to taxation, and The Bay View Association of the United Methodist Church is annually taxed.

75.     If Bay View's cottages were used exclusively for charitable or religious purposes, they would be exempt from taxation under Article IX, § 4 of the Michigan Constitution.[1] However, that has never been the case; taxes are routinely assessed and paid.

76.     Consistent with this distinction, as set forth above, the State affords ecclesiastic entities to identify as such and maintains recordkeeping identifying them as such, but Bay View is not such an entity.

77.     Moreover, Michigan's Court of Appeals explicitly considered how Bay View cottages are

_____

[1] Section 4 provides: Property owned and occupied by non-profit religious or educational organizations and used exclusively for religious or educational purposes, as defined by law, shall be exempt from real and personal property taxes. Michigan Constitution Article IX, § 4.

held and used in a tax case styled *Bay View Association v. Township of Bear Creek and the Department of Treasury*, February 5, 2015, No. 317714.

78. In that case, Bay View argued that it was solely or chiefly organized to provide religious programming and education, charitable works and support for community needs.

79. The matter was fully litigated and this position was rejected, with the Court holding, "While the numerous charitable and benevolent activities petitioner engages in are certainly admirable, it appears petitioner's primary purpose is to provide an exclusive summer vacation community to those who meet its restrictive membership requirements and have the financial means to purchase a summer cottage." *Bay View Ass'n v. Twp. of Bear Creek*, No. 317714, 2015 WL 493355, at *5 (Mich. Ct. App. Feb. 5, 2015).

80. Also, as noted above and reflected in attached communications, LARA has directly rejected recent ongoing efforts to formally align Bay View with the United Methodist Church, declaring such efforts are inapt under State law and violate the provisions under which Bay View was incorporated.

81. Finally, effective November 1, 2015, Bay View's leadership formed a for-profit subsidiary to manage leasehold-related activities, *viz.*, Defendant Bay View Real Estate Management, Inc.

82. This Defendant manages Bay View's real estate assets, including the lots leased to the owners of privately-owned cottages situated on land owned by Bay View, explicitly in the pursuit of profit.[2]

---

[2] Cottage owners lease the land on which their homes sit from Bay View; in other words, the association owns the real property and private individuals own the structures.

**Bay View Membership Policies Create Christian Landlord Class and Relegate Other Religions to Temporary Residency—and These Rules are Enforced in an Arbitrary Manner**

83.　　Only members of the Bay View Association may own a cottage in Bay View.

84.　　As set forth more fully above, to become a member a person must be a member of, or attend, a Christian church.

85.　　This religious test has routinely excluded non-practicing Christians, such as a Member of the Plaintiff group who negotiated the purchase of a cottage in the summer of 2016, only to be denied ownership because he did not regularly attend a Christian church.

86.　　Another Member of the Plaintiff group converted to Judaism, and for that reason was denied membership and the right to be a co-owner of, and ultimately inherit, her parents' cottage, which has been in the family for four generations.

87.　　However, this test is unevenly and arbitrarily applied.

88.　　In addition, the long-term occupancy of Bay View properties is in fact not limited to persons of the same religion.

89.　　A significant proportion of Bay View cottages are either rented out for some or all of a summer season or occupied by individuals who are not members.

90.　　Some members own more than one cottage and rent them for income or they rent to their family, for all or part of each season.  Several cottages appear for short-term rent on the Airbnb.com web site as well.

91.　　Bay View carries out no screening or control over who is present in or rents cottages, or who participates in its various programs.

92.　　Further, there is no follow-up verification as to whether persons who previously met the religious test continue to comply.

93.　　Owners may cease attending church, so there is no assurance that members continue to

qualify as church-attending Christians.

94.    Thus, the actual population of Bay View is not consistently limited to active Christians.

95.    Rather, the religious test imposes a capricious hurdle that potential buyers must overcome.

96.    At the same time, the net result of the disputed policy and practice at issue is that only active Christians may be the owners and landlords within Bay View, collecting the rents and benefits of ownership—while adherents of other religions or no religion at all may make up a sizeable percentage of the people in residence at any given time, but are relegated to passing through with no opportunity to invest or settle in Bay View.

97.    Because of its desirable location on Lake Michigan and its full Chautauqua Program, the sale and rental of cottages is a substantial business in Bay View, one that benefits both the Association and the individual cottage owners.

98.    That benefit simply is not open to the plurality of citizens whose consciences call them toward a spiritual or religious practice that is not favored and aligned with that of Bay View's membership bylaws.

**Bylaws Change and Subsequent Effort to Ensure Preference Is Given to Christian Buyers**

99.    In or around July 2018, members of the community proposed new changes to the bylaws.

100.   First, they sought to institute a reversal of statutory attorney fees that would be assigned in future litigation, such that a party aggrieved by unlawful behavior would have to pay Bay View's attorney fees, contrary to the American Rule on attorney fees and fee shifting statutes of State and Federal law ("retribution amendment").

101.   The purpose of the bylaw was to threaten would-be litigants, including Plaintiffs, should they choose to exercise civil rights in the future.

102.   A second, new proposed bylaw ("Christian perspective amendment") would eliminate the

requirement that a home owner be "of Christian persuasion" and replace it as follows:

> ~~Is of Christian persuasion~~ Agrees to respect the principles of the United Methodist Church and preserve the history and values of the Chautauqua movement. Applicants support the Bay View Association Mission: To be an institution in which Christian values and traditions are central; To enrich the human experience for individuals and families within Bay View and the surrounding community through a seasonal program of religious, educational, cultural and recreational opportunities; to provide a Christian perspective in a changing world.

103. Bay View's leadership unanimously and publicly encouraged passage of the retribution amendment, but urged the community *not* to pass the Christian perspective amendment, which was perceived as loosening the religious test that had historically prevailed at Bay View.

104. However, in the face of threatened legal action/remedy, the Defendant Board partially reversed itself and partially endorsed the Christian perspective amendment, shortly before the vote.

105. On August 2, 2018, the Bay View community voted to reject the retribution amendment, but adopted the Christian perspective amendment, by a slim 2% margin over the required percentage to prevail.

106. As set forth at Paragraph 102, the amendment continues the imposition of a strict religious test as a condition of home ownership by requiring that applicants "respect" the principles of the United Methodist Church.

107. The broad and vague language of the amendment permits ongoing religious discrimination in Bay View. *See* Exh. A, Current bylaws (adopted August 2018).

108. Indeed, the amendment may heighten the discrimination by Defendants because it limits the accepted scope of religious beliefs to the principles endorsed by the United Methodist Church.

109. Moreover, would-be buyers of any faith (or none) must agree to and support a mission "to provide a Christian perspective in a changing world."

110. On or around August 8, 2018, four days after passage of the amendment, Bay View's President, Jon Chism, sent an email to the Bay View membership committee (the body that screens new would-be buyers within Bay View), outlining what "the Board of Trustees believes" should be done to implement the amended bylaws. Exh. J

111. Chism's August 8th email states, in part, that the general wish of the community is "to keep Bay View as a Christian community;" he added that a "gate keeper of Bay View's Christian culture" was needed because of the bylaw change, and that the Board now expected "rigorous" screening of would-be buyers via the membership committee's "stepping-up" as this "gate keeper of Bay View's Christian culture." *Id.*

112. Specifically he directed that people "of Christian persuasion" could be approved for ownership right away, while anyone ***not*** so qualified would be held back and further scrutinized. *Id.*

113. Finally, Chism directed the head of this screening subcommittee to report to him, Chism, anyone who was not on board with the plan to so discriminate.

114. The bylaws amendment did not rectify the discrimination by Defendants, which is ongoing.

115. Moreover, when it became known that Chism's direction made its way to Plaintiff in this case, the head of the committee and recipient of Chism's underhanded direction was removed.

116. The committee chairman, who had served in that capacity for years, was summarily removed and replaced by the individual who had advanced and championed the retribution amendment described above.

117. In short, Chism was true to his word and removed from the committee an individual whom he could not rely upon to enforce de facto discrimination, to be succeeded by a loyalist who had already publicly sought to chill enforcement of civil rights Acts.

**Retaliation**

118. In response and reaction to the Plaintiff's members attempting to advocate for fair housing and adherence to State and Federal law, Defendants have engaged in unlawful retaliation.

119. The retaliation has included writing, supporting/endorsing and otherwise attempting to pass the retribution amendment described above.

120. The retaliation has included wide publication of misleading information and outright falsehoods about the Plaintiffs as a group and individually. Examples include:

    a. Numerous false statements about the Plaintiffs refusing or failing to engage with the Defendants to seek resolution of Defendants' unlawful conduct short of, or in the alternative to, suing; and

    b. Numerous false or misleading statements about the Plaintiffs demanding exorbitant sums to resolve their civil rights claims.

121. These pronouncements are intended to smear the Plaintiff's members before their neighbors.

122. The retaliation has included threatening Plaintiff's member Don Duquette concerning protected conduct under State and Federal law.

123. Specifically on or about March 4, 2019, Defendants caused an attorney to send a letter to Mr. Duquette frivolously threatening him with an attorney grievance and/or legal action, specifically for petitioning the Defendants to stop violating fair housing laws and to be honest with the Bay View community about federal enforcement efforts to bring Bay View into compliance with the law.

124. In fact, Mr. Duquette is not legal counsel in this case, and the letter was simply baseless

intimidation.

125. Other acts of retaliation include damaging/vandalizing the property of Plaintiffs' membership, theft of an item related to the Plaintiff club from one of its member's porches, and similar acts of harassment.

126. Each of the above acts singly, and all of the acts in conjunction, would suffice to dissuade a person of reasonable firmness from engaging in protected conduct.

**Count 1**
**42 U.S.C. § 1983**
**Bay View Is Invested with Powers and Duties of Government**
**and as such Is Bound by U.S. and Michigan Constitutional Prohibitions**
**against Religious Discrimination**

127. Plaintiff incorporates the foregoing paragraphs as if set forth in full here.

128. Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

129. Bay View acts and operates under color of state law, namely pursuant to a delegation of state police powers, including arrest powers, the power to levy taxes and other powers detailed above.

130. Moreover, judicial enforcement of restrictive covenants constitutes state action, per well established, controlling precedent of the U.S. Supreme Court.

131. Section 1983 establishes that any person who, acting under color of law, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

132. This suit is about Bay View's post-amendment 2018 and subsequent policies and practices described above, which deprive Plaintiff and its members from ownership and

disposition of property—including the dwellings or cottages at issue in this suit—based on religion, in violation of the First Amendment's proscription against such establishments.

133.  Specifically, Bay View elevates the Christian religion above all others and above the observance of no religion at all, by endowing practicing Christians with superior rights as compared to all others.

134.  Any reasonable person would understand the clearly established proscription of the First Amendment against such establishments.

135.  On information and belief, Bay View and its Defendant Board *do* know and understand that the ongoing exclusion of individuals who do not specifically espouse Christian beliefs and support one particular church's mission is a violation of the law, and Defendants have knowingly and intentionally continued and persisted in pursuing this unlawful establishment.

136.  As a direct and proximate result of its policies and practices, Plaintiff's members have suffered losses, including financial and emotional.

137.  Based on the knowing and intentional, wanton and willful violation of Plaintiff's clearly established rights, Defendants are further liable for punitive damages.

138.  Because an actual, present and justiciable controversy has arisen between Plaintiff and Defendants, Plaintiff is also entitled to declaratory relief voiding as unlawful the challenged "purpose" clause and bylaws identified above, and/or declaring them judicially unenforceable.

**Count 2**
**A Religious Test for Property Sales Violates the Civil and Religious Rights of Plaintiff**
**as Set Forth in the Michigan Constitution**

139.    Plaintiff incorporates the foregoing paragraphs as if set forth in full here.

140.    This suit is about Bay View's post-amendment 2018 and subsequent policies and practices described above, which deprive Plaintiff and its members from ownership and disposition of property—including the dwellings or cottages at issue in this suit—based on religion, in violation of Michigan Constitution Article I, Sections 2 and 4.

141.    Specifically, Bay View elevates the Christian religion above all others and above the observance of no religion at all, by endowing practicing Christians with superior rights as compared to all others.

142.    As a direct and proximate result of Defendants' policies and practices, Plaintiff's members have suffered losses, including financial and emotional, and they are entitled to monetary relief.

143.    Plaintiff is further entitled to declaratory relief voiding as unlawful the challenged provisions identified above.

**Count 3**
**42 U.S.C. § 3601 *et seq.***
**Bay View's Post-amendment 2018 Discriminatory Practices Violate**
**the Federal Fair Housing Act (FHA)**
**(Disparate Treatment)**

144.    Plaintiff incorporates the foregoing paragraphs as if set forth in full here.

145.    The cottages at issue in this suit are buildings or structures occupied as or designed or intended for occupancy as residences by one or more families.

146.    Accordingly, these structures are "dwellings," within the meaning of the FHA.

147.    The FHA establishes it is unlawful "to refuse to sell or rent after the making of a bona fide

offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of…religion.…"

148.    This suit is about Bay View's post-amendment 2018 and subsequent policies and practices described above, which on their face limit sales and negotiations for sales of the cottages because of religion.

149.    Moreover, the bylaws are enforced in practice, denying non-Christians the opportunities provided to practicing Christians, and the new bylaw has been operationalized to subject non-Christians to greater obstacles to home ownership as compared to Christians, and to be used by "gatekeepers" to maintain Bay View as a Christian neighborhood.

150.    Bay View qualifies for no exemption from enforcement of the FHA because it does not own or operate the dwellings at issue—i.e., the privately-owned cottages.

151.    Bay View qualifies for no exemption from enforcement of the FHA because, as adjudicated by the Michigan Court of Appeals, cottages are used as summer vacation homes and not for religious or charitable purposes.

152.    Bay View qualifies for no exemption from enforcement of the FHA because Defendants are not a religious organization or church.

153.    Bay View qualifies for no exemption from enforcement of the FHA because the sale and rental of cottages occurs for commercial, for-profit purposes.

154.    Members of the Plaintiff organization have been intentionally subject to religious discrimination described above.

155.    As a direct and proximate result, Plaintiff's members have been excluded from ownership of Bay View cottages in violation of this law; have been frustrated or outright prevented from devising or otherwise disposing of their property; have been prevented from selling

their property pursuant to law on an open and unrestricted market; and have been otherwise injured as a result of the unlawful enforcement of the bylaws set forth above.

**Count 4**
**42 U.S.C. § 3601** *et seq.*
**Bay View's Post-amendment 2018 Discriminatory Practices Violate**
**the Federal Fair Housing Act (FHA)**
**(Disparate Impact)**

156. Plaintiff incorporates the foregoing paragraphs as if set forth in full here.

157. The cottages at issue in this suit are buildings or structures occupied as or designed or intended for occupancy as residences by one or more families.

158. Accordingly, these structures are "dwellings," within the meaning of the FHA.

159. The FHA establishes it is unlawful "to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of…religion.…"

160. Bay View qualifies for no exemption from enforcement of the FHA because it does not own or operate the dwellings at issue—i.e., the privately-owned cottages.

161. Bay View qualifies for no exemption from enforcement of the FHA because, as adjudicated by the Michigan Court of Appeals, cottages are used as summer vacation homes and not for religious or charitable purposes.

162. Bay View qualifies for no exemption from enforcement of the FHA because Defendants are not a religious organization or church.

163. Bay View qualifies for no exemption from enforcement of the FHA because the sale and rental of cottages occurs for commercial, for-profit purposes.

164. This suit is about Bay View's post-amendment 2018 and subsequent policies and practices described above, under which Defendants limit sales and negotiations for sales of the

privately-owned cottages based on screenings of applicants for religious affiliation.

165. Defendants' post-amendment 2018 and subsequent bylaws on their face have a disproportionately adverse effect on non-Christians, as do the bylaws as enforced according to Bay View policy and practice.

166. This impact is not otherwise justified by a legitimate rationale.

167. As a direct and proximate result, Plaintiff's members have been disproportionately excluded from ownership of Bay View cottages in violation of this law; have been frustrated or outright prevented from devising or otherwise disposing of their property; have been prevented from selling their property pursuant to law on an open and unrestricted market; and have been otherwise injured as a result of the unlawful enforcement of the bylaws set forth above.

**Count 5**
**42 U.S.C. § 3601 *et seq.* and Michigan's Elliott-Larsen Civil Rights Act (ELCRA)**
**Act 453, of 1976, MCL § 37.2101 *et seq.***
**Bay View's Post-amendment 2018 Retaliation Violates**
**the Federal Fair Housing Act (FHA)**
**(Retaliation)**

168. Plaintiff incorporates the foregoing paragraphs as if set forth in full here.

169. Plaintiff has engaged in a protected act by filing Case No. 17-CV-0622 in this Court.

170. Plaintiff's members have engaged in protected acts by advocating to Defendants adherence to State and Federal fair housing laws and by refusing to participate in unlawful schemes to continue de facto discrimination after the 2018 amendment to the bylaws.

171. Defendants know of Plaintiff's members' protected activities, as indicated by (among other things) filing an answer to the Complaint, by engaging in discussions with Plaintiff's members personally through their boards and officers, and due to public advocacy by Plaintiff's members known to Defendants and their counsel.

172. In retaliation for engaging in this protected conduct, Defendants have engaged in the retaliation described above.

173. That conduct is of a type to dissuade a person of reasonable firmness from pursuing or invoking fair housing laws.

174. As a direct and proximate result, Plaintiff's members have suffered loss of reputation, emotional distress, loss of enjoyment of the activities of daily living, stress, humiliation and outrage.

**Count 6**
**Michigan's Elliott-Larsen Civil Rights Act (ELCRA)**
**Act 453, of 1976, MCL § 37.2101** *et seq.*
**Bay View's Post-amendment 2018 Discriminatory Practices Violate State**
**Anti-discrimination Laws**
**(Disparate Treatment, Disparate Impact)**

175. Plaintiff incorporates the foregoing paragraphs as if set forth in full here.

176. Defendants are "persons" within the meaning of ELCRA, because they are an association, corporation, or a political subdivision of the state, including a special district or authority of the state.

177. The post-amendment 2018 and subsequent conduct of the Defendants described above amounts to:

    a. refusing to engage in a real estate transaction with a person because of religion in violation of MCL § 37.2505;

    b. making dwellings unavailable to persons because of religion in violation of MCL § 37.2502, *et seq.*;

    c. discriminating in the terms and conditions, or privileges of the sale of real estate that indicates a preference or discrimination on the basis of religion in violation of MCL § 37.2502, *et seq.*;

    d. representing to persons because of religion that dwellings are not available for inspection or sale when such dwellings are in fact so available in violation of MCL § 37.2502, *et seq.*;

e. refusing to receive from a person or transmit to a person a bona fide offer to engage in a real estate transaction on the basis of religion in violation of MCL § 37.2502, *et seq.*; and

f. making, printing, circulating, posting, or otherwise causing to be made or published a statement, advertisement, notice, or sign, or use a form of application for a real estate transaction, or making a record of inquiry in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a preference, limitation, specification, or discrimination with respect to the real estate transaction on the basis of religion in violation of MCL § 37.2502, *et seq.*

178. The post-amendment 2018 and subsequent conduct of the Defendants described above constitutes:

a. a pattern or practice of resistance to the full enjoyment of rights granted by the ELCRA;

b. a denial to a group of persons of the rights granted by the ELCRA where that denial constitutes a matter of general public importance; and

c. adversely affecting non-Christians to a disproportionate degree as compared to Christian would-be buyers.

179. Bay View qualifies for no exemption from enforcement of ELCRA because it does not own or operate the dwellings at issue—i.e., the privately-owned cottages.

180. Bay View qualifies for no exemption from enforcement of ELCRA because, as adjudicated by the Michigan Court of Appeals, cottages are used as summer vacation homes and not for religious or charitable purposes.

181. Bay View qualifies for no exemption from enforcement of ELCRA because Defendants are not a religious organization or church.

182. Bay View qualifies for no exemption from enforcement of ELCRA because the sale and rental of cottages occurs for commercial, for-profit purposes.

183. Defendants' post-amendment 2018 and subsequent conduct described above was, and remains, intentional, willful, and it has been taken in disregard for the rights of others.

184. In the alternative, in practice, the new bylaw of Defendant Bay View Association

disparately impacts Plaintiff and its members.

185.  As a direct and proximate result of the violations of law set forth above, Plaintiff's members have been excluded from ownership of Bay View cottages; have been prevented from devising or otherwise disposing of their property; have been frustrated or outright prevented from selling their property on an open and unrestricted market; and have been otherwise injured as a result of the unlawful enforcement of the bylaws identified herein.

**Count 7**
**2018 Amendments to Bylaws Fail under Established Michigan Law**

186.  Plaintiff incorporates the foregoing paragraphs as if set forth in full here.

187.  In *People v. Young Men's Father Matthew T.A.B. Society*, 41 Mich. 67, 1 NW 913 (1879), Michigan's Supreme Court held that bylaws cannot set forth a religious qualification for membership in a Michigan corporation if the articles of association are silent on the subject.

188.  Bay View's articles require that candidates for membership be of good moral character, *without* stipulating a religious affiliation, while the post-amendment 2018 Bay View bylaws set forth the requirements for membership which include, among other things, that the applicant espouses Christian beliefs and supports a particular Christian Church's mission.

189.  As such, the bylaws cannot be enforced, and are void.

**RELIEF REQUESTED**

For all of the foregoing reasons, Plaintiff demands judgment by this honorable Court that:

1.  Declares that the Defendants' 2018 post-amendment policies and practices, as alleged herein, including the Christian perspective amendment, violate the U.S. Constitution, and cannot be judicially enforced.

2.  Declares that the Defendants' policies and practices, as alleged herein, including the

Christian perspective amendment, violate the FHA.

3.  Declares that the Defendants' policies and practices, as alleged herein, including the Christian perspective amendment, violate the Michigan Constitution.

4.  Declares that the Defendants' policies and practices, as alleged herein, including the Christian perspective amendment, violate the ELCRA.

5.  Declares that the Defendants' Christian perspective amendment, as alleged herein, violate other State statutes as set forth above, including the Summer Resort Act, the Michigan Nonprofit Corporation Act, MCL § 455.91 and MCL § 450.2488.

6.  Enjoins the Defendants, and all persons in active concert or participation with Defendants, from:

    a.  discriminating against any person on the basis of religion in any aspect of the sale or transfer of ownership of a dwelling;

    b.  failing or refusing to notify the public that dwellings owned or offered for sale by the Defendants are available to all persons on a nondiscriminatory basis; and

    c.  failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of the Defendants' unlawful practices to the position that they would have been in were it not for the discriminatory conduct.

7.  Awards such damages as would fully compensate each person aggrieved by the Defendants' discriminatory housing practices for injuries caused by the Defendants' pattern or practice of discriminatory conduct, and as is further authorized for punitive/exemplary damages pursuant to 42 U.S.C. §§ 1983, 1988 and/or MCL § 37.2501 *et seq.* and other law.

8.  Assesses any and all costs, interest, fees, and civil penalties against the Defendants as the law provides.

9.  Affords all other declaratory, legal or equitable relief that appears appropriate at the time

of final judgment.

Respectfully submitted,
SALVATORE PRESCOTT
& PORTER, PLLC

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com

Dated: April 17, 2019

## JURY DEMAND

Plaintiff, by and through its attorneys, demands a trial by jury of all issues in this matter.

Respectfully submitted,
SALVATORE PRESCOTT
& PORTER, PLLC

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
Dated: April 17, 2019     prescott@spplawyers.com